No. 8915.

RAY *v.* THE PEOPLE.

1. JURORS—*Challenge for Cause—Opinions.* Challenges for cause are tried by the courts. Its conclusions will not be reviewed, unless manifestly erroneous, and prejudicial to the party complaining.

Indictment of a Woman for Murder. Several jurors examined on the voir dire, declared that they would require stronger evidence to convict a woman of crime, than a man. Others, that they entertained conscientious scruples against the infliction of the death penalty. No juror declared that he would lay aside his convictions so announced, the answer in each case leaving an impression of uncertainty in the juror's mind. *Held* that there was no abuse of discretion in allowing a challenge for cause as to each of these jurors. *Stratton v. The People,* 5 Colo. 276, distinguished.

2. CRIMINAL LAW—*Reputation of the Accused*, is not to be assailed in the first instance. Indictment of a woman for the murder of her husband. Previous illicit relations with one Albright, and a desire to return to his embraces was received, to show a motive for the crime. The prisoner testifying in her own behalf admitted her relations with Albright, and repeated acts of unchastity. *Held*, in view of this confession, that the admission of the testimony of her relations with Albright was not prejudicial.

Letters from Albright found in possession of the prisoner were admitted in evidence for the people. Inasmuch as they added no smirch to that made by her own testimony, their admission, though improper was held not injurious.

3. APPEAL AND ERROR—*Mere Nondirection*, no charge being prayed, is not error.

*Error to Routt District Court, Hon. John T. Shumate, Judge.*

Mr. ARTHUR L. WESSELS, Mr. E. W. NORLIN, and Messrs. CRUMP & ALLEN, for plaintiff in error.

Hon. LESLIE E. HUBBARD, Attorney General, and Mr. CHARLES ROACH, Assistant, for the People.

Mr. Justice Scott delivered the opinion of the court:

The plaintiff in error was convicted of the murder of her husband, James Ray. The verdict was murder in the second degree. The errors assigned which seem important to consider are: (1) Irregularities in the selection of the jury panel; (2) That the people attacked the character of the defendant in the first instance; (3) The admission of certain letters in evidence, purporting to be addressed to and received by the defendant; and (4) Neglect or failure of the court to instruct as to manslaughter.

It is urged that certain jurors were upon motion of the people discharged for cause, and that by reason thereof the regular panel was exhausted, and an open venire issued in order to complete the jury. The contention is that but for the action of the court in erroneously sustaining these several challenges, the jury could have been selected without

exhausting the regular panel, a right to which the defendant was entitled. There were nine such challenges sustained.

Juror Bergman testified that it would take stronger evidence to cause him to vote to inflict the death penalty upon a woman than a man; that his reason for this was that a woman is weaker. Upon examination by the court, the juror stated that as a general rule he would give the same consideration to the evidence in the case of the woman as in case of a man, but in further answers repeatedly said that it would require stronger evidence to convict in case of a woman than in that of a man.

Juror Cochran answered substantially to the same effect and further, that he would not put a man and a woman on the same basis in considering the question of guilt or innocence.

Juror Gill testified that it would take stronger evidence for him both to convict and to fix the death penalty in case of a woman than if a man was being tried.

Juror Earl testified that he had religious and conscientious scruples against the infliction of the death penalty, and that these would certainly prevent his inflicting the death penalty, even where the law and the evidence warranted.

Juror Brobeck said that he had conscientious scruples against infliction of the death penalty in case of a woman and that he could not agree to such a verdict.

Juror Hitchins testified that it would take stronger evidence in case of conviction of a woman than in that of a man. He also testified that if the evidence established the guilt of the defendant, he would not hesitate to return a verdict of guilty, the same as in case of a man.

Juror Grimes testified repeatedly that he would not vote to inflict the death penalty under any circumstances. Juror Dunkley testified that it would require stronger evidence for him to convict in case of a woman, and also that he believed that he could render a verdict according to the law and the evidence.

Juror Kemry testified substantially to the same effect and

in answer to a question by the court, said that he might convict a man on certain testimony, and refuse to convict a woman on the same evidence.

In no case does it appear from the answers of the juror that he could and would lay aside his convictions so announced. It does not appear from the record whether or not it was necessary to excuse all of these jurors, or only one or more of them, in order to make it incumbent on the court to issue the open venire.

Counsel for defendant rely on *Stratton v. People*, 5 Colo. 276, to sustain this contention of prejudicial error. We do not so construe that decision. The rule laid down in that case, as we understand it, is that conscientious scruples against the infliction of the death penalty do not in a capital case, necessarily disqualify the juror entertaining them, but if notwithstanding his conscientious scruples he will render a verdict in accordance with the law and the evidence, and if upon this point his answers have no uncertainty, this is all the law requires.

In the case of each of the jurors here, there seems to be so much of conflict in his answers as to leave an impression of uncertainty in the juror's mind, sufficient in our opinion to justify the exercise of the sound discretion of the court in determining the competency of the juror.

The general rule of law in this respect is stated in 24 Cyc. 280, to be:

"Jurors to be competent must stand indifferent, having no bias or prejudice for or against either party. The juror must be indifferent both as to the person and the cause to be tried, and must be so at the time of the trial. Bias or prejudice may arise from such a variety of causes and depends so much upon the facts and circumstances of the particular cases that no definite rule can be laid down; but the true inquiry in all cases is whether the juror will act with entire impartiality, in deciding which, except in those cases where the law conclusively presumes bias, much must be left to the discretion of the court, which, unless clearly abused, will not be interfered with."

And in *Salzer v. Taylor,* 18 Colo. 538, 33 Pac. 369, we said:

"The overruling of a challenge to one of the jurors is assigned for error. The challenge was upon the ground of a previously formed opinion. In civil, as well as criminal actions, challenges for cause are triable by the court. The decision of the trial court upon such challenge is not ground for reversal by an appellate court unless the decision is manifestly erroneous and prejudicial to the party complaining of it. This rule is particularly applicable when the decision of the challenge depends upon oral evidence as in this case. From the evidence submitted, we cannot say that the trial court erred in concluding that the juror had not formed or expressed an unqualified opinion or belief as to the merits of the action."

It was also said in *Denver & S. P. R. R. Co. v. Driscoll,* 12 Colo. 520, 21 Pac. 708, 13 Am. St. 243:

"We think the answers of Mt. Altman were such as to justify the court in sustaining the plaintiff's challenge to him; but aside from this, when a full examination of a juror leaves the question of his competency doubtful, we should hesitate to interfere with the ruling of the trial court thereon."

We think we can well say as to each of the jurors whose competency is urged in this case, as was said by this court in *Independence Co. v. Kalkman,* 61 Colo. 98, 156 Pac. 135, that:

"In such circumstances the question rests largely in the discretion of the trial court, and when his testimony is considered as a whole, we cannot agree that the court abused its discretion in this regard."

There is no contention that any juror who sat on the trial was not in all respects fair and impartial, or was in any sense subjected to undue influence. We do not find prejudicial error in this respect.

As relates to the introduction of the testimony tending to impeach the character of the defendant, this testimony with one exception concerns testimony as to statements and admissions of the defendant. The exception was the testi-

mony of one witness to the effect that prior to the marriage of defendant, she and a man named Albright held themselves out to the public as husband and wife, when in fact they were not. We think that the most that can be said of the testimony is that it was generally immaterial, but we cannot say that it was prejudicial to the defendant in the light of her own testimony, as to her acts and conduct.

The general rule that the character of a defendant may not be impeached by the prosecution in the first instance is too well settled for discussion. But in this case there was no attempt to prove bad reputation. The specific matter above suggested was offered in connection with other testimony, in an attempt to prove motive, it being the contention of the People that a desire to return to Albright was the motive that induced the defendant to slay her husband. The defendant, however, appeared as a witness in her own behalf, and voluntarily testified as to her unchaste life, which was the sole reflection on her character implied in the testimony complained of. How she could have been prejudiced by the statement of a single instance of wrong, when she voluntarily testified to her repeated acts of unchastity, and her shameful life, is difficult to understand.

There was introduced in evidence for the purpose of proving motive, certain letters purporting to have been written by this man Albright, then in Arizona, and to have been received by the defendant. These letters were found among the defendant's possessions, and we think not properly identified in the first instance, and for such reason at least, not properly admissible at the time. Without discussing the subject of the admissibility of letters written by a third person and received by a defendant, charged with a criminal offense, it is sufficient to say that these letters contained no matter vitally effecting the character of the defendant. They in substance professed great love for the defendant, and a desire to be with her, and an affection for defendant's young daughter. They carry the imprint of illiteracy, coarseness, and an utter disregard for defendant's marital relations. But they contain no statements of illicit rela-

tions or of other wrong upon the part of defendant, nor do they indicate any meeting between the parties, subsequent to the marriage of the defendant and the deceased husband, nor do they add to defendant's reflection in her testimony, as to her own character. These letters had no proper place in the case, but we cannot say that their admission was prejudicial to the defendant.

The homicide occurred on the 7th day of November, 1915, at Oak Creek. The defendant testified that she came to Oak Creek from Idaho, in February, 1915; that she had been previously married, and brought with her a child of twelve years of age; that she came from Pocatello to Oak Creek with Albright; that she tried to get work but could not, and went to a cabin with Albright and another man, and kept house for them a week, when she was ordered by an officer to leave. That she then went to Oak Creek to find 'work, and failing to secure employment, stayed at the "Reedy place," a house of prostitution. Three days after, she met Ray at the Reedy house. That he came there and remained every night for about ten days, and that they then went to a boarding house and remained, where she lived as Ray's wife until they were married February 25th. She had not seen Albright since her marriage.

Ray conducted a saloon and gambling house in Oak Creek, and later added a restaurant to it, which was conducted by defendant. The testimony shows that the couple frequently quarreled and that her husband was extremely brutal. The defendant testifies that on one occasion in August, at the Reedy house, where both the defendant and deceased were dancing and drinking with the inmates and patrons, they quarreled and Ray brutally beat and abused her.

On the night of the homicide, according to defendant's testimony, they were engaged in dancing and drinking at the Reedy house. Defendant testifies that Ray came into the dance hall during the evening and told her that a man called "Frenchy" had two or three hundred dollars on his person, and that they might as well get it as not, and that he asked her to get Frenchy and take him up to their house. That she refused to do this, and said to her dancing part-

ner, that she "supposed she would get the dickens beat out of her." That they went into the bar with several of Ray's friends, and had some drinks, and after closing time, went home. That Ray took three men along with him for the purpose of getting up a game of poker. When they reached the house they continued drinking in a room prepared for poker playing. Soon thereafter Ray left the house, and in a few minutes defendant went out to find him. He had said he was going to try to find Frenchy. Defendant came home, and not finding Ray, went down town a second time, and found Ray with some other men and they finally started home. That Ray cursed and abused her on the way home, for the reason that she had not found Frenchy. He said that "when he got her in the house he was going to give her the worst beating of her life; that he would damn near kill her; that she was sticking her nose in his business, and would not help him." That they entered the house and walked into the kitchen; that he started to strike her saying, "You thought you was beat up the last time, but wait till I get through with you now." That she pleaded with him not to do so, but that he again struck her on the head, and grabbed her by the throat and threw her back on a table, and again struck her on the head. That then she threw her hand back on the table, and it came in contact with a revolver, and she then began shooting.

It appears that she shot him twice with fatal effect. Defendant says she did not know how the gun happened to be on the table; that she exclaimed at the time of the shooting, "you will beat me will you," and that she thought she was going to be killed. No other person saw the occurrence, although others were in the house and heard the noise, and no other person gave testimony of any importance as to the killing. She is corroborated as to the assault to the extent that her head was bruised in places.

The people offered testimony tending to prove threats of defendant to kill Ray, and she admits saying that if Ray ever again beat her up as he did at the Reedy place, she was afraid she would kill him. There was testimony on the part of the defendant tending also to show deliberation

at the time of the shooting, in that she admits that she took time to adjust the safety on the revolver before shooting. The whole testimony shows a sordid and disgusting mode of life upon the part of both plaintiff and deceased, and a community condition almost incredible in Colorado, at this period.

The miserable, and apparently hopeless and helpless life led by the defendant presents a strong appeal to human sympathy, and we have scrutinized the record with great care, but find no prejudicial error in the trial of the cause.

It is urged that the court erred in not instructing as to manslaughter. We think this a proper instruction under the facts and circumstances of the case, but counsel for defendant made no request for such an instruction. This alleged error constitutes mere non-direction and is not reversible error. It was said by this court in *Mow v. People,* 31 Colo. 357, 72 Pac. 1072, that:

"If the rule were otherwise, the trial judge would practically be required to instruct on every question which the accused might have the right to have submitted to the jury, without his attention being called to questions which counsel, alive to the interests of their clients, would think of and the trial judge would not. It would open the door for counsel to sit silently by and allow the court to commit error in failing to instruct on points which their duty to their client should prompt them to request."

And in *McQueary v. People,* 48 Colo. 214, 110 Pac. 210, 21 Ann. Cas. 560, that mere non-direction is not ground for reversal unless an instruction, good in law, and justified by the facts is tendered and refused.

The judgment is affirmed.

*En banc.*

White, C. J., Hill and Teller, J. J., dissent.