No. 15,549.

MARTIN *v.* THE PEOPLE.
(162 P. [2d] 597)

Decided October 1, 1945.

Mr. RALPH L. CARR, Mr. ANTHONY F. ZARLENGO, Mr. WILBUR E. ROCCHIO, for plaintiff in error.

Mr. H. LAWRENCE HINKLEY, Attorney General, Mr. DUKE W. DUNBAR, Deputy, Mr. JAMES S. HENDERSON, Assistant, for the people.

*En Banc.*

MR. JUSTICE HILLIARD delivered the opinion of the court.

PLAINTIFF in error (defendant) was convicted of the "crime against nature," as that offense is set forth in 1944 Supplement to '35 C.S.A., chapter 48, section 64 (S.L. '39, p. 318, §1), and suffered judgment of sentence to the state penitentiary. Briefly, the showing had to do with defendant's alleged misconduct with one of two sailors of the war service, in circumstances presently to be stated.

The sum of defendant's assignments of error necessary to consider, is, that, in the course of the trial, in two separate instances, the district attorney so demeaned himself that prejudicial error intervened.

It is informing to state that the alleged untoward act of defendant was said to have occurred in his living quarters, located in one of the smaller cities of Colorado, where he was engaged in operating a business of considerable proportions; that on the day preceding the time of the alleged offense defendant made the acquaintance of the sailors while he was on a business trip to Cheyenne, Wyoming; that on the following day the sailors accompanied him to his home city, and arrangements were made whereby the sailors would stay overnight with defendant in his apartment. There was evidence of conversation carried on by the three of them to the effect that there are people who are prone to conduct themselves within contemplation of the inhibitions of the statute here, and that to the "initiated" such persons are known as "queers," or one such individual as a "queer." The charge is that defendant car-

ried on with one of the sailors in such manner that in testifying, the sailors referred to defendant as a queer.

On the night in question, the sailors, leaving defendant's apartment toward midnight, took his billfold and what money there was in it, his watch, his automobile, his gas coupons and a larger sum of money from his office safe, and perhaps some other items. The sailors asserted that defendant turned all the items over to them in consideration of their promise not to reveal his alleged conduct, already mentioned, while defendant stated that the sailors had robbed him of his moneys and goods. On defendant's complaint, the sailors were subsequently apprehended at a point in Utah, then and there having in their possession the automobile and other personal items, except that they had expended a portion of the moneys they had taken. They were returned to the county in Colorado whence they had removed the property which we have mentioned, were informed against in relation to such taking and were tried therefor. After their trial, the information charging defendant with the offense involved in this inquiry was filed. In the course of the trial on the information against defendant, the sailors testified to the effect that he was guilty of the act charged, while defendant made categorical denial thereof. In relation to the district attorney's cross-examination of defendant on this feature of his testimony, the following is quoted from the record:

"Q. These threats of calling you a queer, as you say, didn't affect you? A. I had no fear of that. It had an effect, it would on any man, and I hated to have them do it, because I knew they would do exactly what they have done, and I knew the consequence would be exactly this. Q. You testify to the effect that you aren't a queer? A. No, sir, I am not. You have known me a number of years. Q. Now, Mr. Martin, do you mean by that answer to put your reputation in evidence here?"

At this point defendant's counsel interposed and said: "Just a minute. We ask that that last portion be stricken as not being responsive.

"Mr. Chilson: It was a voluntary answer.

"The Court: It is cross-examination, it may stand. He is cautioned to answer questions only."

Proceeding, the District Attorney asked: Q. "I would like to ask the question, if you desire to put your reputation in evidence here, Mr. Martin?" Counsel for defendant objected.

"The Court: He may answer. Overruled.

"Q. Do you wish to put your general reputation for morality in evidence here, Mr. Martin? A. I think we should try the case as charged. Q. In other words, I take it from that that you do not want—"

Counsel for defendant interrupting: "We again object. It is highly improper cross-examination.

"The Court: The question has been substantially answered. You may proceed."

The sailors testified that they understood defendant was paying his wife twenty thousand dollars as a property settlement in a divorce proceeding. On that subject, the district attorney, proceeding over objection, was permitted to cross-examine defendant, who said: "I did not tell the boys that I was going to pay my wife $20,000 for a divorce." In the further cross-examination of defendant by the district attorney, the following occurred:

"Q. As a matter of fact, Mr. Martin, that is what you have agreed to pay your wife, isn't it?

"Mr. Zarlengo: I object as immaterial, your Honor, has no bearing on the issues in this case.

"The Court: Overruled. It is cross-examination.

"Q. Isn't that a fact? A. Am I to answer the question? Q. The Court says you may answer? A. I haven't paid any such sum. Q. I said agreed. A. The divorce

isn't final, and I am not sure it will be final. Q. Will you answer my question? A. Will you restate the question? Q. I will ask you whether or not it is a fact that you have agreed to pay your wife twenty thousand dollars in the property settlement. A. We have made a settlement in the divorce for twenty thousand dollars. Q. Do you have any idea where the boys got this idea that you were going to pay twenty thousand dollars in the divorce settlement? A. They could have heard it outside, in my place or in the place next door. They were in and out all evening. Q. Was it common knowledge outside? A. I had hoped not, but it seems to be. Q. As a matter of fact, Mr. Martin, the only place two strangers, and particularly strangers in uniform could have gotten that information was from you, yourself? A. No, that is the last thing I would have told them. Q. Do you wish the jury to believe that they picked that information up somewhere on the street or in the restaurant or from some casual acquaintance? A. I think they gained considerable information during the afternoon about me before they made the robbery. Q. You think that is where they got their idea you were a queer and they could shake you down?

"Mr. Zarlengo: Just a minute. We object to this question as being highly improper, and we renew our motion as to this question and the question previously asked about reputation.

"The Court: The motion is overruled."

■ It is elementary, that, unless, and until, the defendant in a criminal prosecution has introduced evidence of good reputation, the prosecution may not introduce evidence of accused's bad reputation. "The general rule that the character of a defendant may not be impeached by the prosecution in the first instance," as we have said, "is too well settled for discussion." *Ray v. People,* 63 Colo. 376, 167 Pac. 954. The Colorado case—as well as cases of like import from nearly all state and federal jurisdictions—is cited in 22 C.J.S., p. 1069, §676,

in support of the doctrine announced there, that, "It is almost universally agreed that the state is not entitled to introduce evidence of the bad character or reputation of accused unless he has clearly and expressly put his character in issue by introducing evidence of good character." See, also, *Ryan v. People,* 66 Colo. 208, 180 Pac. 84.

The attorney general argues, that, since in the course of the district attorney's cross-examination, he asked defendant, "You testify to the effect that you aren't a queer?" and defendant answered, "No, sir, I am not. You have known me a number of years," that the further cross-examination in relation to defendant's reputation finds justification. The prosecuting officer's efforts in that regard, which we have set out at length, were in harmony with the fact that defendant, as clearly appears, had not introduced evidence of his good reputation; hence, as the distinguished prosecutor must have appreciated, the people could not introduce evidence otherwise. Notwithstanding the well-recognized procedural rule controlling in the premises, the district attorney, proceeding not once, but repeatedly—always over objections of defendant's counsel (invariably overruled by the court), challenged defendant to put his reputation in issue. We cannot think the course pursued was other than unfair and unjust, and altogether prejudicial to the rights of defendant. In a situation comparable in principle, in relation to the persistence of the prosecuting attorney quite similar, but less pregnant with prejudice than here (*Heller v. People,* 2 Colo. App. 459, 31 Pac. 773), the judgment was affirmed by the appeals court, but reversed by us on review. 22 Colo. 11, 43 Pac. 124. The intermediate court affirmance was based on the fact that there the trial court sustained defendant's objections and ordered elimination of the objectionable matter; in the present case, however, the trial court throughout gave countenance to the district attorney's prejudicial conduct. In our opinion in the

Heller case, written by Chief Justice Hayt, in which Justices Goddard and Campbell concurred, we quoted from the Court of Appeals opinion, and then proceeded to set forth the doctrine that moved us to disagree with the distinguished intermediate court, and order reversal of the judgment, as follows:

" 'We admit that the remarks incorporated into the record as having been uttered by the prosecuting attorney were highly improper and unwarranted, but in face of the fact that the record shows that objections were interposed by counsel for defendant, and that those objections were sustained and the remarks eliminated, and counsel cautioned by the court to refrain from further comments of that nature, that the defendant secured through the court a correction of this misconduct, and we are warranted in assuming that, in view of the action of the court, that the jury were not influenced or prejudiced against the defendant by the course pursued by counsel for the prosecution'." Thus said the Court of Appeals, and affirmed the judgment. We concluded otherwise, saying:

"We cannot agree with that court in the conclusion that the error was corrected by the district court, or that the defendant's case was not prejudiced by the improper conduct alluded to; for while it is true that as often as appealed to, the court sustained the defendant's objection to the unwarranted statements and improper insinuations of the district attorney, it is equally true that the action of the court was had in such a manner as to have no effect upon the district attorney, who persisted in the improper conduct the same as before.

"The court does not seem to have made any attempt to punish counsel in any way for these improprieties or to have reprimanded him for his unprofessional conduct. In this connection the language of this court in the case of *Smith v. The People*, 8 Colo. 457, is directly in point: 'The criticism on the action of the court is that the judge failed to assert and maintain the author-

ity and dignity of the court, by reason whereof a prisoner upon trial was prejudiced. The law places at the command of all judicial tribunals ample power and means to enforce obedience to their lawful orders in such cases, by the way of fines, and, if necessary, imprisonment. It is the duty of courts to require their proceedings to be conducted according to the rules of law, and to protect the rights of litigants. That the proceedings in this instance were defective in the essentials mentioned is fully shown by the record. We are further of opinion that the errors complained of were not cured, for which reasons the judgment must be reversed and the cause remanded.'

"So in this case we think that the covert insinuations as well as the direct attacks made by the district attorney upon the defendant were well calculated to prejudice the jury against him. * * *

"In the light of this record we cannot say that the improper conduct of the district attorney did not have much to do in influencing the jury against the defendant. This undoubtedly was the effect desired, but whether it had such effect or not it is unnecessary to determine. It is sufficient for us to know that it might have been the means of procuring a verdict of guilty, and for this misconduct of counsel alone the defendant should be awarded a new trial. * * * The evidence is very conflicting. It was the province of the jury to decide upon this conflict, and what influence the improper conduct of * * * the district attorney, * * * may have had upon the jury, no human being can say with certainty; but of one thing we feel there is no doubt, and that is that the defendant did not have a fair trial."

In *State v. Nelson*, 148 Minn. 285, 181 N. W. 850, there is an exhaustive review of the authorities on the subject of the admission of evidence in the matter of a defendant's reputation, etc., and one point specifically involved and determined was that, by an irresponsive answer to a question propounded by the prosecutor on

cross-examination, the defendant did not "open his character to investigation." The court there said that, regardless of the defendant's reputation, "he was entitled to have the charge of his guilt, * * * determined by minds reflecting calmly upon competent evidence unaffected by * * * suggestions and insinuations of the existence of harmful facts not proved."

■ We do not regard as sound the suggestion of the attorney general to the effect, that, since defendant had testified in chief as to where he was born, his education, the length of his residence in the county of the scene of the alleged crime, his military service, etc., he had thereby "placed his reputation in evidence." Defendant not only did not testify as to his good reputation, it is not from such source that evidence of reputation, good or bad, may emanate. Only other witnesses, as we are persuaded, are competent to give testimony as to an accused's reputation.

■ Considering that the trial of the sailors for robbery, necessarily preceding defendant's trial, was of and concerning the situation that existed the night of defendant's alleged offense, we think the voluntary exclamation by one of the sailors, that they were acquitted of the charge against them, was, of course, incompetent, and fraught with such implications that from that moment defendant was so handicapped that practically his conviction could not have been in doubt. There is nothing to indicate that the district attorney promoted the witness' outburst, but that does not detract from its damaging effect. He had examined one of the sailors as to the fact of their arrest for robbery, and asked him, "And charges were filed against you? A. Yes, sir, robbery charges. Q. And you were tried on those charges? A. Yes, sir." When the second sailor was interrogated, the district attorney asked, "Then you were brought back? A. Yes. Q. Charged with robbery and larceny? A. And acquitted." Counsel for defendant thereupon moved for a "mistrial," which was de-

nied. We think the motion should have been granted. By the sailor's answer the jury trying defendant were apprised that another jury had believed the sailors, and thus their story against defendant was fortified by incompetent and most damaging testimony. The evil which attends unfair atmosphere developed in a court room, is illustrated in many situations. The following cases are instances: *Leech v. People,* 112 Colo. 120, 146 P. (2d) 346; *Paine v. People,* 106 Colo. 258, 103 P. (2d) 686; *Webster v. Commonwealth,* 223 Ky. 369, 3 S. W. (2d) 754; *People v. Wells,* 100 Cal. 459, 34 Pac. 1078.

Measured by any rule of justice, as our study of the record moves us to say, defendant was not accorded a fair trial.

Let the judgment be reversed, and the cause remanded.

MR. JUSTICE STONE did not participate.